## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| S.S.K. NANDURI, derivatively on behalf of GOGO, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL J. SMALL, OAKLEIGH THORNE, NORMAN SMAGLEY, BARRY ROWAN, ROBERT L. CRANDALL, HUGH W. JONES, RONALD T. LEMAY, MICHELE COLEMAN MAYES, ROBERT H. MUNDHEIM, CHRISTOPHER D. PAYNE, CHARLES C. TOWNSEND, JOHN WADE, and HARRIS N. WILLIAMS,<br><br>Defendants,<br><br>and<br><br>GOGO, INC.,<br><br>Nominal Defendant. | Case No.:<br><br><br><br><br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff S.S.K. Nanduri ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Gogo, Inc. ("Gogo" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Michael J. Small, Oakleigh Thorne, Norman Smagley, Barry Rowan, Robert L. Crandall, Hugh W. Jones, Ronald T. LeMay, Michele Coleman Mayes, Robert H. Mundheim, Christopher D. Payne, Charles C. Townsend, John Wade, and Harris N. Williams (collectively, the "Individual Defendants," and together with

Gogo, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Gogo, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Gogo, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Gogo's directors and officers from February 27, 2017 through the present (the "Relevant Period").

2.      Gogo provides in-flight internet connectivity to business and commercial airplanes. The Company has three operating segments: Commercial Aviation-North America ("CA-NA"), Commercial Aviation-Rest of World ("CA-ROW," and collectively with CA-NA, "CA"), and Business Aviation ("BA").

3.      Announced in 2014 and launched in 2016, Gogo's 2Ku is a proprietary dual antenna system designed to bring streaming internet to aircraft in flight. It is the Company's most current iteration of its global satellite system.

4.      During the Relevant Period, the Individual Defendants caused the Company to reveal that reliability issues existed with its 2Ku system antennae installed on individual aircraft, which the Company attributed to deicing fluid used on airplanes. However, the extent of these issues was not fully revealed to the market until, at the earliest, May 4, 2018.

5.      On May 4, 2018, the Company issued a press release, held a conference call with analysts and investors, and filed a Form 10-K with the SEC for the fiscal year ended December 31, 2018, all of which revealed that the issues caused by deicing fluid were more serious than originally indicated.

6.      During the May 4, 2018 conference call, it was also revealed that there were manufacturing and software issues with the 2Ku antennae.

7.      The May 4, 2018 press release moreover revealed that the Company was revising its financial guidance for fiscal 2018 downward.

8.      On this news, the price per share of Gogo stock fell $1.73 per share, or 18%, from its closing price on May 3, 2018 over the following two trading days, closing at $7.86 per share on May 7, 2018.

9.      After markets closed on May 7, 2018, credit rating service Moody's announced that it had downgraded Gogo's credit rating, due in part to the deicing issues.

10.      On this news, the price per share of Gogo stock fell $2.80 per share, or over 35%, from its closing price on the previous trading day, closing at $5.06 per share on May 8, 2018.

11.      During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

12.      In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

13. Moreover, during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Gogo, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) there existed greater reliability issues with the 2Ku systems' antennae than had been disclosed prior to May 4, 2018; (2) such reliability issues, including deicing fluid penetrating the 2Ku system antennae, required replacement or modification of installed 2Ku antennae, at a large cost to Gogo; (3) as a result, Gogo's 2018 guidance was misleading; and (4) the Company failed to maintain internal controls.

14. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

15. The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

16. The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its former Chief Executive Officer ("CEO"), its CEO, its former Chief Financial Officer ("CFO"), its CFO, and its Chief Operating Officer ("COO") and Executive Vice President to a federal securities fraud class action lawsuits pending in this Court (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

17. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Illinois or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

23. Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

24. Plaintiff is a current shareholder of Gogo. Plaintiff has continuously held Gogo common stock at all relevant times.

### Nominal Defendant Gogo

25. Gogo is a Delaware corporation with its principal executive offices at 111 North Canal St., Suite 1500, Chicago, Illinois 60606. Gogo's shares trade on the NASDAQ under the ticker symbol "GOGO."

### Defendant Thorne

26. Defendant Oakleigh Thorne ("Thorne") has served as the Company's President and CEO since March 4, 2018 and as a Company director since 2006. According to the Company's Schedule 14A filed with the SEC on April 27, 2018 (the "2018 Proxy Statement"), as of March 31, 2018, Defendant Thorne beneficially owned 25,652,784 shares of the Company's common stock, which represented 29.4% of the Company's outstanding common stock.[1] Given that the price per share of the Company's common stock at the close of trading on March 29, 2018 was $8.63, Thorne owned approximately $221.4 million worth of Gogo stock.[2]

---

[1] Includes 25,450,823 shares held directly by Thorndale Farm Gogo, LLC, 139,536 shares held directly by OAP, LLC, and 62,425 shares of common stock issuable upon the exercise of options which were unexercised as of March 31, 2018, but were exercisable within a period of 60 days from such date. Defendant Thorne is the CEO of Thorndale Farm, Inc. and the managing

27.     For the fiscal year ended December 31, 2017, Defendant Thorne received $199,938 in compensation from the Company. This included $60,000 in fees paid or earned in cash, $69,697 in stock awards, and $69,971 in option awards. In connection with his position as President and CEO, Defendant Thorne is entitled to a base salary of $700,000 and is eligible for a bonus with a target of 100% of his base salary. He is also entitled to benefits and perquisites, including $150,000 cash payment to cover relocation expenses, reimbursement of up to $25,000 in legal expenses in connection with negotiating the terms of his employment, and equity awards.

28.     The Company's 2018 Proxy Statement stated the following about Defendant Thorne:

> *Oakleigh Thorne*[3] has served as our President and Chief Executive Officer since March 4, 2018. Mr. Thorne also serves as the CEO of Thorndale Farm, L.L.C., which oversees investment of Thorne family assets. From 1996 to 2009, Mr. Thorne served as the Co-President of Blumenstein/Thorne Information Partners, L.L.C., a private equity and venture capital firm. From 2000 to 2007, Mr. Thorne served as Chairman and CEO of eCollege.com, a then-publicly traded provider of outsourced eLearning solutions, and he previously served as CEO of Commerce Clearing House Inc. and as a director of ShopperTrak and MachineryLink. Mr. Thorne currently serves as a director of Helix Education, Inc., in addition to various charitable organizations. Mr. Thorne served as a member of the board of directors of Aircell, our predecessor company, from 2003 until January 2007.

29.     Upon information and belief, Defendant Thorne is a citizen of Illinois.

---

member of OAP, LLC. Thorndale Farm, Inc. is the managing member of Thorndale Farm Gogo, LLC. Excludes 40,611 shares of common stock issuable upon settlement of outstanding deferred stock units.

[2] March 31, 2018 was a Saturday, and markets were closed on March 30, 2018 in observance of Good Friday. Thus, for the purposes of determining the value of shareholdings as of March 31, 2018, this Complaint uses the closing price on March 29, 2018, the last trading day prior to March 31, 2018.

[3] Emphasis in original unless otherwise noted throughout.

**Defendant Rowan**

30.     Defendant Barry Rowan ("Rowan") has served as the Company's Executive Vice President, Finance since April 2017, and was appointed the Company's Executive Vice President and CFO in May 2017. According to the 2018 Proxy Statement, as of March 31, 2018, Defendant Rowan beneficially owned 90,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2018 was $8.63, Rowan owned approximately $776,700 worth of Gogo stock.

31.     For the fiscal year ended December 31, 2017, Defendant Rowan received $2,820,928 in compensation from the Company.[4] This included $310,685 in salary, a $100,000 bonus, $633,550 in stock awards, $1,547,640 in option awards, $166,176 in non-equity incentive plan compensation, and $62,877 in all other compensation.

32.     The Company's 2018 Proxy Statement stated the following about Defendant Rowan:

> *Barry Rowan* joined us as Executive Vice President, Finance in April 2017 and in May 2017 he became our Executive Vice President and Chief Financial Officer. Mr. Rowan previously served as Executive Vice President and Chief Financial Officer of Cool Planet Energy Systems from March 2013 to April 2017, as Executive Vice President, Chief Financial Officer and Chief Administrative Officer for Vonage Corporation from 2010 to 2013, and as Executive Vice President, Chief Financial Officer and Treasurer for Nextel Partners from 2003 to 2006. Mr. Rowan earned his Master's degree in Business Administration from the Harvard Business School and his Bachelor's degree in Business Administration and Chemical Biology *summa cum laude* from The College of Idaho.

33.     Upon information and belief, Defendant Rowan is a citizen of Illinois.

---

[4] Reflects compensation following the commencement of Defendant Rowan's employment on April 24, 2017.

**Defendant Small**

34.     Defendant Michael J. Small ("Small") served as the Company's CEO and President from February 2010 to March 4, 2018. According to the 2018 Proxy Statement, as of March 31, 2018, Defendant Small beneficially owned 2,075,860 shares of the Company's common stock, which represented 2.3% of the Company's outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2018 was $8.63, Small owned over $17.9 million worth of Gogo stock.

35.     For the fiscal year ended December 31, 2017, Defendant Small received $2,268,463 in compensation from the Company. This included $687,671 in salary, $189,246 in stock awards, $878,046 in option awards, $501,200 in non-equity incentive plan compensation, and $12,300 in all other compensation.

36.     As part of a separation agreement between Defendant Small and Gogo, Defendant Small received a severance payment of $700,000, a payment of $58,333 in lieu of the requirement to provide 30 days' notice of termination, another payment of $250,000, reimbursement for COBRA health insurance premiums for 12 months, and reimbursement of up to $25,000 of Defendant Small's legal expenses in connection with negotiating the terms of his separation.

37.     The Company's Schedule 14A filed with the SEC on April 26, 2017 (the "2017 Proxy Statement") stated the following about Defendant Small:

> *Michael J. Small* has served as our President and Chief Executive Officer since February 2010. Mr. Small has more than 30 years of experience in the communications industry. From January 1999 until November 2009, Mr. Small served as the Chief Executive Officer and a director of then-public Centennial Communications Corporation, a regional telecommunications service provider, where he was responsible for the strategic direction, financial well-being, and operational performance of the organization. From 1995 to 1998, Mr. Small served as Executive Vice President and Chief Financial Officer of 360 Degrees

Communications Company. Mr. Small has served on the board of directors of First Midwest Bancorp since 2010.

38.     Upon information and belief, Defendant Small is a citizen of Illinois.

**Defendant Smagley**

39.     Defendant Norman Smagley ("Smagley") served the Company's CFO from September 2010 until May 4, 2017. He continued to serve as Senior Finance Advisor until December 31, 2017. According to the 2018 Proxy Statement, as of March 31, 2018, Defendant Smagley beneficially owned 386,084 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2018 was $8.63, Smagley owned over $3.3 million worth of Gogo stock.

40.     For the fiscal year ended December 31, 2017, Defendant Smagley received $1,009,847 in compensation from the Company. This included $345,509 in salary, $207,146 in non-equity incentive plan compensation, and $456,922 in all other compensation (which included $386,250 in cash severance and $40,000 in outplacement services).

41.     The Company's 2017 Proxy Statement stated the following about Defendant Smagley:

> *Norman Smagley* has served as our Chief Financial Officer since September 2010. Mr. Smagley brings over 20 years of experience as a chief financial officer for both public and private companies across many industries, with experience at technology, financial services, pharmaceutical, retail, industrial and publishing companies. Most recently, Mr. Smagley served as Senior Vice President and Chief Financial Officer of Rand McNally, a publisher of maps, atlases and other reference materials, from May 2002 to March 2010. Mr. Smagley received both his Master's Degree in Finance and his Bachelor's degree in Economics from The Wharton School of the University of Pennsylvania. Mr. Smagley will retire from his positions as our Executive Vice President and Chief Financial Officer immediately following the filing of the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2017, which is expected to occur on May 4, 2017.

42.     Upon information and belief, Defendant Smagley is a citizen of Illinois.

10

**Defendant Wade**

43.     Defendant John Wade ("Wade") is the President of Gogo's Commercial Aviation Division. He previously served as the Company's COO and Executive Vice President from April 2016 through April 2018 and has worked for Gogo since 2008. According to the 2018 Proxy Statement, as of March 31, 2018, Defendant Wade beneficially owned 438,821 shares of the Company's common stock.[5] Given that the price per share of the Company's common stock at the close of trading on March 29, 2018 was $8.63, Wade owned approximately $3.8 million worth of Gogo stock.

44.     For the fiscal year ended December 31, 2017, Defendant Wade received $1,320,925 in compensation from the Company. This included $390,137 in salary, $145,242 in stock awards, $442,801 in option awards, $331,945 in non-equity incentive plan compensation, and $10,800 in all other compensation.

45.     The Company's 2018 Proxy Statement stated the following about Defendant Wade:

> *John Wade* joined us in November 2008. In August 2016, Mr. Wade became our Chief Operating Officer. Effective May 1, 2018, Mr. Wade will become our President, Commercial Aviation Division. Prior to joining Gogo, Mr. Wade served as Chief Technical Officer and General Manager of in-flight mobile phone and internet provider, OnAir, from February 2005 to November 2008. He was responsible for OnAir's internet business, including sales, strategy, customer relationship management and product development. Mr. Wade has more than 20 years of experience in the avionics and in-flight communications industries, having also held positions at in-flight internet and connectivity services provider Tenzing Communications, as well as PRIMEX Aerospace Company and GEC Marconi In-Flight Systems. Mr. Wade received his education at the University of Brighton, U.K., where he earned a First Class B Engineering Honors Degree in Electronic Engineering.

---

[5] Includes 402,235 shares of common stock issuable upon the exercise of options which were unexercised as of March 31, 2018, but were exercisable within a period of 60 days from such date.

46.     Upon information and belief, Defendant Wade is a citizen of Illinois.

**Defendant Crandall**

47.     Defendant Robert L. Crandall ("Crandall") has served as a Company director since 2006, and is a member of the Audit Committee. According to the 2018 Proxy Statement, as of March 31, 2018, Defendant Crandall beneficially owned 134,520 shares of the Company's common stock.[6] Given that the price per share of the Company's common stock at the close of trading on March 29, 2018 was $8.63, Crandall owned approximately $1.2 million worth of Gogo stock.

48.     For the fiscal year ended December 31, 2017, Defendant Crandall received $189,938 in compensation from the Company. This included $50,000 in fees earned or paid in cash, $69,967 in stock awards, and $69,971 in option awards.

49.     The Company's 2018 Proxy Statement stated the following about Defendant Crandall:

> *Robert L. Crandall* is the former chairman and CEO of AMR Corporation and American Airlines. From 1998 to 2012, Mr. Crandall served on the board of directors of Celestica Inc. Mr. Crandall served as a member of the board of directors of Aircell, our predecessor company, from 2003 until January 2007.

**Defendant Jones**

50.     Defendant Hugh W. Jones ("Jones") has served as a Company director since 2016, and is a member of the Audit Committee. According to the 2018 Proxy Statement, as of March 31, 2018, Defendant Jones beneficially owned 25,142 shares of the Company's common

---

[6] Includes 125,586 shares of common stock issuable upon the exercise of options which were unexercised as of March 31, 2018, but were exercisable within a period of 60 days from such date. Excludes 38,892 shares of common stock issuable upon settlement of outstanding deferred stock units.

stock.[7] Given that the price per share of the Company's common stock at the close of trading on March 29, 2018 was $8.63, Jones owned $216,975 worth of Gogo stock.

51.     For the fiscal year ended December 31, 2017, Defendant Jones received $189,938 in compensation from the Company. This included $50,000 in fees earned or paid in cash, $69,967 in stock awards, and $69,971 in option awards.

52.     The Company's 2018 Proxy Statement stated the following about Defendant Jones:

> *Hugh W. Jones* is a co-founder of Basalt Investments, LLC. Mr. Jones previously served as President of Sabre Airline Solutions from April 2011 to August 2017. From 1996 to 2011, Mr. Jones held a number of other executive positions at Sabre including COO of Sabre Travel Network and Airline Solutions. Mr. Jones previously served as the president and CEO of Travelocity. He began his career in the travel industry at American Airlines in 1988, serving in a variety of finance positions.

**Defendant LeMay**

53.     Defendant Ronald T. LeMay ("LeMay") has served as a Company director since 2006, and serves as Chairman of the Board. According to the 2018 Proxy Statement, as of March 31, 2018, Defendant LeMay beneficially owned 2,320,902 shares of the Company's common stock, which represented 2.6% of the Company's outstanding common stock.[8] Given that the price per share of the Company's common stock at the close of trading on March 29, 2018 was $8.63, LeMay owned over $20 million worth of Gogo stock.

---

[7] Includes 25,142 shares of common stock issuable upon the exercise of options which were unexercised as of March 31, 2018, but were exercisable within a period of 60 days from such date. Excludes 10,959 shares of common stock issuable upon settlement of outstanding deferred stock units.

[8] Includes 1,801,690 shares of our common stock pledged by Defendant LeMay as security for loans, and 519,212 shares of common stock issuable upon the exercise of options which were unexercised as of March 31, 2018, but were exercisable within a period of 60 days from such date. Excludes 31,169 shares of common stock issuable upon settlement of outstanding deferred stock units.

54.     For the fiscal year ended December 31, 2017, Defendant LeMay received $264,943 in compensation from the Company. This included $75,000 in fees earned or paid in cash, $94,984 in stock awards, and $94,959 in option awards.

55.     The Company's 2018 Proxy Statement stated the following about Defendant LeMay:

> *Ronald T. LeMay* has served as Chairman and CEO of Main Street Data, Inc. (an advanced analytics company) and Aquarius Solutions, Inc. (an asset utilization company) since January 2017, and as Managing Director of OpenAir Equity Partners (a venture capital firm formed to make early stage investments in wireless companies) since September 2008. In addition, Mr. LeMay has served as Chairman of the Board of October Capital (a private investment company) since February 2001 and Razorback Capital (a private investment company) since August 2006 and as a director of Zubie, Inc. from May 2016 to present and Hyla, Inc. from September 2010 to present. Previously, Mr. LeMay served as Representative Executive Officer of Japan Telecom from November 2003 until the sale of the company in July 2004 and as President and Chief Operating Officer of Sprint Corporation from October 1997 until April 2003. Mr. LeMay was a director of Imation from July 1996 (except for the period from August 5, 1997 to December 31, 1997) until his retirement from the board in May 2012 and was a director of Allstate Corporation until he retired from the board in May 2014. Mr. LeMay has served as the Chairman of our board of directors since July 2006. He served as our Executive Chairman from July 2006 to June 2013, except during the period from July 2009 to February 2010, during which he served as our Chief Executive Officer.

**<u>Defendant Mayes</u>**

56.     Defendant Michele Coleman Mayes ("Mayes") has served as a Company director since 2016. She also serves as a member of the Audit Committee. According to the 2018 Proxy Statement, as of March 31, 2018, Defendant Mayes beneficially owned 26,042 shares of the Company's common stock.[9] Given that the price per share of the Company's common stock at

---

[9] Includes 25,142 shares of common stock issuable upon the exercise of options which were unexercised as of March 31, 2018, but were exercisable within a period of 60 days from such date. Excludes 18,767 shares of common stock issuable upon settlement of outstanding deferred stock units.

the close of trading on March 29, 2018 was $8.63, Mayes owned approximately $224,742 worth of Gogo stock.

57.     For the fiscal year ended December 31, 2017, Defendant Mayes received $189,938 in compensation from the Company. This included $50,000 in fees earned or paid in cash, $69,967 in stock awards, and $69,971 in option awards.

58.     The Company's 2018 Proxy Statement stated the following about Defendant Mayes:

> *Michele Coleman Mayes* currently serves as Vice President, General Counsel and Secretary of the New York Public Library (NYPL). She joined NYPL in August 2012 after serving as Executive Vice President and General Counsel for Allstate Insurance Company since 2007. Prior to Allstate, she served as a Senior Vice President and the General Counsel of Pitney Bowes Inc. from 2003 to 2007 and in several legal capacities at Colgate-Palmolive from 1992 to 2003. In 1982, Ms. Mayes entered the corporate sector as managing attorney of Burroughs Corporation. After Burroughs and Sperry Corporation merged, creating Unisys Corporation, she was appointed Staff Vice President and Associate General Counsel for Worldwide Litigation. From 1976 through 1982, she served in the U.S. Department of Justice as an Assistant United States Attorney in Detroit and Brooklyn, eventually assuming the role of Chief of the Civil Division in Detroit. She chaired the American Bar Association Commission on Women in the Profession from 2014 to 2017 and is a Fellow of the American College of Corporate Governance Counsel. Ms. Mayes served as a director of Assurant, Inc. from 2004 to 2007, where she also served as a member of the Audit Committee and Chairman of the Nominating and Governance Committee.

**Defendant Mundheim**

59.     Defendant Robert H. Mundheim ("Mundheim") has served as a Company director since 2012. According to the 2018 Proxy Statement, as of March 31, 2018, Defendant Mundheim beneficially owned 200,430 shares of the Company's common stock.[10] Given that the price per

---

[10] Includes 94,686 shares of common stock issuable upon the exercise of options which were unexercised as of March 31, 2018, but were exercisable within a period of 60 days from such date. Excludes 38,255 shares of common stock issuable upon settlement of outstanding deferred stock units.

share of the Company's common stock at the close of trading on March 29, 2018 was $8.63, Mundheim owned over $1.7 million worth of Gogo stock.

60.    For the fiscal year ended December 31, 2017, Defendant Mundheim received $204,938 in compensation from the Company. This included $65,000 in fees earned or paid in cash, $69,967 in stock awards, and $69,971 in option awards.

61.    The Company's 2018 Proxy Statement stated the following about Defendant Mundheim:

> *Robert H. Mundheim* has been Of Counsel to Shearman & Sterling LLP since 2000. Since 2012, Mr. Mundheim has also served as a Professor of Corporate Law and Finance at the University of Arizona James E. Rogers College of Law. From 1992 to 1999, Mr. Mundheim was Executive Vice President and General Counsel of Salomon Inc. and Senior Executive Vice President and General Counsel of Salomon Smith Barney Holdings Inc., and prior to that, he was Co-Chairman of the New York law firm of Fried, Frank, Harris, Shriver & Jacobson LLP and University Professor of Law and Finance at the University of Pennsylvania Law School, where he taught since 1965 and served as Dean from 1982 to 1989. Mr. Mundheim has also served as General Counsel to the U.S. Treasury Department, Special Counsel to the Securities and Exchange Commission and Vice Chairman, Governor-at-Large and a member of the Executive Committee of the National Association of Securities Dealers. He previously served as Chairman of the board of directors of Quadra Realty Trust, Inc. and as a director of Weeden & Co. LP, eCollege.com, Benjamin Moore & Co., Commerce Clearing House Inc., Arnhold & S. Bleichroeder Holdings, Inc., Hypo Real Estate Holding AG and First Pennsylvania Bank. Mr. Mundheim currently serves as a member of the Board of Trustees of the New School and the Board of Trustees of the Curtis Institute of Music, a Trustee of the American College of Corporate Governance Counsel and a director of the Salzburg Global Seminar.

**Defendant Payne**

62.    Defendant Christopher D. Payne ("Payne") has served as a Company director since 2014. According to the 2018 Proxy Statement, as of March 31, 2018, Defendant Payne beneficially owned 58,595 shares of the Company's common stock.[11] Given that the price per

---

[11] Includes 57,095 shares of common stock issuable upon the exercise of options which were

share of the Company's common stock at the close of trading on March 29, 2018 was $8.63, Payne owned approximately $505,674 worth of Gogo stock.

63.     For the fiscal year ended December 31, 2017, Defendant Payne received $189,938 in compensation from the Company. This included $50,000 in fees earned or paid in cash, $69,967 in stock awards, and $69,971 in option awards.

64.     The Company's 2018 Proxy Statement stated the following about Defendant Payne:

> *Christopher D. Payne* has served as the Chief Operating Officer of DoorDash Inc. since January 2016. Mr. Payne was formerly the CEO of Tinder, Inc. from March 2015 to September 2015, the Senior Vice President, North American Marketplaces of eBay Inc. from September 2010 to December 2014 and the founder and CEO of Positronic, Inc. from July 2007 until December 2008, when it was sold to eBay. Mr. Payne previously served as a Vice President at Amazon from 1998 to 2001 and a Vice President at Microsoft from 2001 to 2007. Mr. Payne also was on the board of directors of Rue La La from July 2011 to October 2013.

**Defendant Townsend**

65.     Defendant Charles C. Townsend ("Townsend") has served as a Company director since 2010. According to the 2018 Proxy Statement, as of March 31, 2018, Defendant Townsend beneficially owned 2,238,397 shares of the Company's common stock, which represented 2.6% of the Company's outstanding common stock.[12] Given that the price per share of the Company's common stock at the close of trading on March 29, 2018 was $8.63, Townsend owned over $19.3 million worth of Gogo stock.

---

unexercised as of March 31, 2018, but were exercisable within a period of 60 days from such date. Excludes 21,691 shares of common stock issuable upon settlement of outstanding deferred stock units.

[12] Includes 63,786 shares of common stock issuable upon the exercise of options which were unexercised as of March 31, 2018, but were exercisable within a period of 60 days from such date. Excludes 36,148 shares of common stock issuable upon settlement of outstanding deferred stock units.

66.     For the fiscal year ended December 31, 2017, Defendant Townsend received $189,938 in compensation from the Company. This included $50,000 in fees earned or paid in cash, $69,967 in stock awards, and $69,971 in option awards.

67.     The Company's 2018 Proxy Statement stated the following about Defendant Townsend:

> *Charles C. Townsend* currently serves as Managing General Partner of Bluewater Wireless II, L.P. Mr. Townsend founded Aloha Partners LP in 2001 and served as its Managing General Partner until 2008. Mr. Townsend also served as the Managing General Partner of Aloha Partners II from 2006 to 2014. From 1988 to 1998, Mr. Townsend served as President and CEO of the Atlantic Cellular Company. Since January 2004, Mr. Townsend has also served as President of Pac 3, LLC.

### Defendant Williams

68.     Defendant Harris N. Williams ("Williams") has served as a Company director since 2014, and serves as Chair of the Audit Committee. According to the 2018 Proxy Statement, as of March 31, 2018, Defendant Williams beneficially owned 72,776 shares of the Company's common stock.[13] Given that the price per share of the Company's common stock at the close of trading on March 29, 2018 was $8.63, Williams owned approximately $628,056 worth of Gogo stock.

69.     For the fiscal year ended December 31, 2017, Defendant Williams received $209,938 in compensation from the Company. This included $70,000 in fees earned or paid in cash, $69,967 in stock awards, and $69,971 in option awards.

70.     The Company's 2018 Proxy Statement stated the following about Defendant Williams:

---

[13] Includes 63,786 shares of common stock issuable upon the exercise of options which were unexercised as of March 31, 2018, but were exercisable within a period of 60 days from such date. Excludes 22,440 shares of common stock issuable upon settlement of outstanding deferred stock units.

*Harris N. Williams* serves as Senior Managing Director of WF Holding Company LLC, a diversified asset management business. From 2005 to 2013, Mr. Williams was an executive with Ripplewood Holdings, LLC, a global private equity firm focused on control investments, serving as Managing Director since 2007. Prior to 2005, Mr. Williams was in the Investment Banking division of Credit Suisse, primarily focused on mergers and acquisitions and leveraged buyouts. Mr. Williams's industry areas of focus have included Technology, Media, Financial Services, Healthcare, Industrials and Hospitality on a global basis. Mr. Williams served on the board of directors of 3W Power Holdings Ltd. from 2011 to 2013, where he also served as Chairman of the Audit Committee.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

71.     By reason of their positions as officers and/or directors of Gogo and because of their ability to control the business and corporate affairs of Gogo, the Individual Defendants owed Gogo and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Gogo in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Gogo and its shareholders so as to benefit all shareholders equally.

72.     Each director and officer of the Company owes to Gogo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

73.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Gogo, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

74.     To discharge their duties, the officers and directors of Gogo were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

75.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Gogo, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Gogo's Board at all relevant times.

76.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

77.     To discharge their duties, the officers and directors of Gogo were required to exercise reasonable and prudent supervision over the management, policies, practices, and

internal controls of the Company. By virtue of such duties, the officers and directors of Gogo were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Illinois, and the United States, and pursuant to Gogo's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Gogo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Gogo and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Gogo's operations would comply with all applicable laws and Gogo's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

78.      Each of the Individual Defendants further owed to Gogo and the shareholders the duty of loyalty requiring that each favor Gogo's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

79.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Gogo and were at all times acting within the course and scope of such agency.

80.      Because of their advisory, executive, managerial, and directorial positions with Gogo, each of the Individual Defendants had access to adverse, non-public information about the Company.

81.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Gogo.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

82.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

83.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act.

84.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Gogo was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

85.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

86.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Gogo, and was at all times acting within the course and scope of such agency.

## GOGO'S CODE OF ETHICS

87.     The Company's Code of Business Conduct and Ethics (the "Code of Ethics"),

"applies to all employees and directors," both of which are referred to as employees throughout

the Code of Ethics.

88.     The Code of Ethics provides, as to the requirement to "Maintain the Integrity of

the Company's Books and Records," in relevant part, that:

> All employees, and in particular the chief financial officer, controller or principal accounting officer, and chief executive officer, have a responsibility to ensure that the Company's accounting records do not contain any false or intentionally misleading entries. Employees must never enter information in Gogo's books or records that intentionally misleads, misrepresents, misinforms, omits or disguises the true nature of any transaction or result.

> Management maintains a system of internal accounting controls meant to preserve integrity and objectivity, and this system is augmented by a program of written policies and procedures, management reviews and training of qualified personnel. Gogo's internal control procedures for initiating and recording transactions are a strict guideline and are to be strictly observed.

89.     In relevant part, the Code of Ethics provides, in a section titled "Compete

Honestly and Fairly," that:

> Employees should not take unfair advantage of anyone through manipulation, concealment, abuse of confidential or privileged information, falsification, misrepresentation of material facts or any other practice involving unfair dealing.

90.     The Code of Ethics provides, in a section titled "Comply with All Applicable

Laws," that:

> Gogo and its employees must comply with all applicable laws, rules and regulations, some of which are discussed elsewhere in this Code. While it is beyond the scope of this Code to address all of the laws, rules and regulations that apply to Gogo's business, violations of these laws, rules or regulations may result in severe penalties, including criminal or civil penalties for Gogo and the employees involved in the violations and possible liability in private actions. It is therefore critical that employees work with the Legal Department to understand the antitrust, anti-corruption, privacy, employment-related and other laws applicable to the Gogo business in which the employee is engaged and consult the General Counsel with any questions or concerns regarding legal compliance.

91.     The Code of Ethics provides, as to "Reporting Code Violations," that:

All employees share responsibility for ensuring that Gogo as a whole conducts itself according to the highest ethical standards and strives to avoid even the appearance of impropriety. To report concerns about potential violations of this Code and any other ethics or integrity issues, including questions or concerns involving the Company's accounting, auditing, financial reporting or internal controls, employees should contact the General Counsel by mail or email (GeneralCounsel@gogoair.com) or Gogo's Ethics Line at 1-866-607-1184 or https://gogo.alertline.com.

92.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## GOGO'S CODE OF FINANCIAL ETHICS

93.     The Company "expects all financial employees to adhere" to the principles of the Code of Financial Ethics, it requires that the CEO and CFO, among others, "shall acknowledge in writing his or her responsibility for adherence to the Code of Financial Ethics."

94.     The Code of Financial Ethics provides that employees covered thereby will, among other things:

• Provide full, fair, accurate, timely and understandable financial disclosures in documents filed with, or submitted to, the Securities and Exchange Commission, any other government agency or self-regulatory organization, or used in other public communications. Any accounting records for which [a covered employee is] responsible that underlie the financial statements included in these disclosures will be prepared in accordance with generally accepted accounting principles

applied consistently with the principles used to prepare the audited financial statements;

• Comply with applicable laws, rules and regulations of federal, state, provincial and local governments, the Securities and Exchange Commission, the NASDAQ Stock Market, and other applicable private and public regulatory agencies;

• Act in good faith, responsibly, with due care, competence and diligence, and without misstating, misrepresenting or omitting material facts or circumstances or allowing [the covered employee's] independent judgment to be subordinated

95.    The Code of Financial Ethics also imposes reporting obligations on covered employees, stating, in relevant part, that covered employees will:

Report questionable accounting, internal accounting control, auditing or fraud matters, or allegations of non-compliance with this Code of Financial Ethics to management. If [the covered employee] do[es] not feel that any such issues raised have been resolved appropriately, [the covered employee] will report [his or her] concerns to any member of the Company's Board of Directors, or by using the Gogo Ethics Line as provided in the Company's Code of Business Conduct and Ethics

96.    In violation of the Code of Financial Ethics, Defendants Thorne, Small, Smagley and Rowan conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Financial Code of Ethics, Defendants Thorne, Small, Smagley and Rowan failed to maintain the accuracy of Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Financial Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

97.     Through its subsidiaries, Gogo provides in-flight broadband internet connectivity and wireless entertainment to commercial and business aircraft in the United States and internationally.

98.     In 2014, Gogo announced its next-generation satellite system, 2Ku. In a Form 10-K filed with the SEC on February 22, 2018, the Company touted 2Ku as "the most rapidly adopted technology in the industry."

### False and Misleading Statements

#### *2016 10-K*

99.     On February 27, 2017, the Company filed its annual report with the SEC for the fiscal quarter and year ended December 31, 2016 on Form 10-K (the "2016 10-K"), signed by Defendants Small, Smagley, LeMay, Crandall, Jones, Mayes, Mundheim, Payne, Thorne, Townsend, and Williams.

100.     The 2016 10-K touted that the Company had reduced its installation costs per aircraft for the 2Ku system, stating, in relevant part:

**Reduce Our Investment per Aircraft**

Our investment per aircraft is the installed cost of airborne equipment less the proceeds received from the airline. In 2016, we significantly reduced the installation cost per 2Ku aircraft by shortening the installation time from eight days to three days, and reduced equipment cost through engineering improvements and volume discounts. Furthermore, based on agreed-upon terms for our 2Ku awarded but uninstalled aircraft, proceeds from airlines as a percentage of 2Ku installation costs will increase from 2017 to 2018. In addition, our ability to leverage our growing portfolio of supplemental type certificates ("STCs") will further reduce the cost of and time required to install new fleets.

101.     The 2016 10-K additionally provided an installation schedule for its 2Ku system, stating, in relevant part:

> We started rolling-out our 2Ku service during 2016. As of December 31, 2016, 2Ku was installed on 94 CA aircraft operated by five airline partners and ***an additional 450 to 550 aircraft are expected to be installed during 2017***. Our ability to meet our installation schedule is dependent on certain variables not within our control, including the availability of aircraft and the speed with which we are able to obtain STCs from the FAA and similar foreign regulatory agencies for our 2Ku equipment.

(Emphasis added.) Notably, equipment failures were not among the "certain variables not within our control" noted in the 2016 10-K.

102.    Regarding the Company's liquidity, the 2016 10-K stated, in relevant part:

*Liquidity:*

> Although we can provide no assurances, we currently believe that cash, cash equivalents and short-term investments on hand as of December 31, 2016 will be sufficient to meet our working capital and capital expenditure requirements for at least the next twelve months, including installing our ATG-4 and Ku equipment on certain aircraft operated by our airline partners, costs related to international expansion, costs associated with launching and installing our 2Ku technology and costs associated with developing our next generation ATG solution.

103.    Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Small and Smagley attesting to the accuracy of the 2016 10-K.

***2017 Proxy Statement***

104.    On April 26, 2017, the Company filed the 2017 Proxy Statement. Defendants Crandall, Jones, LeMay, Mayes, Mundheim, Payne, Small, Townsend, Thorne, and Williams solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[14]

---

[14] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

105.    Regarding the Company's Code of Ethics, the 2017 Proxy Statement asserted, in relevant part:

> We have a long-standing commitment to conduct our business in accordance with high ethical principles. Our Code of Business Conduct and Ethics applies to our directors, chief executive officer, chief financial officer, chief accounting officer and all other officers and employees. Our Code of Financial Ethics applies to our chief executive officer, chief financial officer, chief accounting officer and any other key employees performing finance or accounting functions. Copies of the Code of Business Conduct and Ethics and the Code of Financial Ethics may also be accessed on the corporate governance section of our investor relations website at www.ir.gogoair.com.

106.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed, as the Individual Defendants violated the Code of Ethics, including by allowing false and misleading statements to be issued to the investing public.

107.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay for performance" elements while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

108.    Further, the 2017 Proxy Statement failed to disclose that: (1) there existed greater reliability issues with the 2Ku systems' antennae than had been disclosed prior to May 4, 2018; (2) such reliability issues, including deicing fluid penetrating the 2Ku antennae, required replacement or modification of installed 2Ku system antennae, at a large cost to Gogo; (3) as a result, Gogo's 2018 guidance was misleading; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business,

operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### December 12, 2017 Press Release

109.    On December 12, 2017, the Company issued a press release titled "More than 500 Commercial Aircraft Now Flying with Gogo's 2Ku Technology." The press release touted the adoption of 2Ku technology and improved installation times, without revealing reliability issues with the 2Ku antennae.

110.    The press release quoted Defendant Small as stating:

*2Ku is the best performing connectivity solution in the market* and that performance has resulted in the technology becoming the most rapidly adopted broadband satellite connectivity solution in the history of commercial aviation . . . we continue to grow our backlog of 2Ku aircraft, we are also focused operationally on making sure 2Ku also becomes the most rapidly deployed technology in commercial aviation history.

(Emphasis added.)

### February 16, 2018 Press Release

111.    On February 16, 2018, the Company issued a press release titled "Aeromexico to Install 2Ku on Additional Boeing 737-800 Aircraft." Despite touting the continued adoption of 2Ku technology, the press release failed to disclose any of the reliability issues that 2Ku antennae experienced during the 2017-2018 winter season.

### February 22, 2018 Press Release & Conference Call

112.    On February 22, 2018, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2017, and providing guidance for fiscal year 2018. The press release stated, in relevant part:

For the full year ending December 31, 2018, the Company expects:

- Total revenue of $865 million to $935 million (or $750 million to $790 million under ASC 605, an increase of 7% to 13% from 2017)

    - CA-NA revenue of $445 million to $485 million, of which approximately 20% is equipment revenue (or $380 million to $415 million under ASC 605)

    - CA-ROW revenue of $125 million to $165 million, of which approximately 50% is equipment revenue (or $75 million to $90 million under ASC 605)

    - BA revenue of $285 million to $295 million (same as under ASC 605)

- ***Adjusted EBITDA of $75 million to $100 million (or $65 million to $90 million under ASC 605, an increase of 11% to 54% from 2017).*** We estimate that 2018 Adjusted EBITDA under ASC 605 would be approximately $15 million higher when adjusting for the accounting impact of the airline-directed model.

- ***An increase of 550 to 650 2Ku aircraft online, of which approximately 300 are expected to be in CA-ROW. Total 2Ku aircraft online as of December 31, 2018 of 1,100 to 1,200***.

- Gross capital expenditures of $150 million to $170 million and Cash CAPEX of $110 million to $130 million, of which approximately 35% is related to airborne Cash CAPEX. In addition, we expect airborne equipment inventory purchases related to airline-directed installations of $15 million to $30 million.

***Free Cash Flow is expected to improve from 2017 to 2018 driven by Adjusted EBITDA growth and lower Cash CAPEX***. The Company reaffirms its target of becoming Free Cash Flow positive in 2019 and for the full year 2020. The Company will provide an update to its other long-term targets under ASC 606 on the Company's first quarter 2018 earnings conference call in May 2018.

(Emphasis added.)

113.    The Company also held a conference call with analysts and investors on February 22, 2018 to discuss its financial results for the quarter and year ended December 31, 2017.

Regarding the 2Ku system, Defendant Wade stated, in relevant part:

As we've mentioned in earlier releases, we've shortened installation times for 2Ku to as low as 30 hours, which is less than half the time it typically takes to

install a broadband satellite system. We continue to focus on helping our airline partners achieve installation process efficiencies. Our extraordinary pace of 2Ku installs and modem upgrades has not been without its challenges. The performance of the systems has been expected; however, any time you introduce high-tech systems of this scale and speed we've been doing it, there are likely to be early-stage growing pains. 2Ku is not exempt from that phenomenon; *on some aircraft we saw degraded reliability. We've identified the root cause of all of these issues, and have fixes for all of them that have either been deployed or in the process of being deployed.* By midyear 2018, we expect the entire 2Ku fleet to operate at the same market-leading performance levels that most 2Ku aircrafts are now achieving.

(Emphasis added.)

114.    Later, in response to an analyst's question, Defendant Wade attributed the

reliability issues to deicing fluid used on airplanes:

*[O]n the reliability issues. It was actually really caused by the deicing fluid, which was able to penetrate under some of the [radar,]*[15] *which caused the antennas to temporarily get sticky, if you will. The fix to that was very easy to do, and we've deployed that on a number of aircraft* and we're not seeing any further issues around that at this time.

(Emphasis added.)

*2017 10-K*

115.    After markets closed on February 22, 2018, the Company filed its annual report

on Form 10-K for the fiscal quarter and year ended December 31, 2017 (the "2017 10-K"),

signed by Defendants Small, Rowan, LeMay, Crandall, Jones, Mayes, Mundheim, Payne,

Thorne, Townsend, and Williams.

116.    Regarding the installation of 2Ku systems, the 2017 10-K stated, in relevant part:

In 2014, we announced our next generation 2Ku global satellite system ("2Ku"), which has become the most rapidly adopted technology in the industry. *Sixteen*

---

[15] This alteration is as it appears in Thompson Reuters' edited transcript of the earnings call. Upon information and belief, this alteration was in error, and Defendant Wade stated that deicing fluid was penetrating under some of the *radomes*. A radome is "a dome or other structure protecting radar equipment and made from material transparent to radio waves, especially one on the outer surface of an aircraft."

> *domestic and international airlines have selected 2Ku for installation on approximately 2,000 commercial aircraft and as of December 31, 2017, our 2Ku system had been installed on more than 550 aircraft.* Of the aircraft installed with 2Ku in 2017, 298 were upgrades from currently-installed Gogo systems. The 2Ku system is currently capable of delivering peak speeds of 100 Mbps to the aircraft. . . . Our leading global market share supports our continued investment in ongoing research and development and the global operating capabilities required to support our aviation partners' needs. Our technology roadmap includes plans for continued rapid improvement in bandwidth speeds and other performance metrics of our inflight systems.

(Emphasis added.)

117.    The 2017 10-K also discussed the introduction of the Company's "proprietary next generation modem," stating, in relevant part:

> We also recently introduced a proprietary next generation modem into CA service, which enhances our 2Ku and Ku solutions. Our new modem was installed on 284 aircraft at December 31, 2017 and is expected to be on all 2Ku and Ku aircraft by the end of 2018. This modem is capable of increasing throughput from the satellite to the aircraft by approximately 16 times as compared to our prior generation modem, and greatly reduces hand-off time between satellites compared to our previous generation modem.

118.    The 2017 10-K touted that the Company had reduced its installation costs per aircraft for its 2Ku system in 2017, stating, in relevant part:

> **Reduce Our Investment per Aircraft**
>
> In CA, we define investment per aircraft as the installed cost of airborne equipment less the proceeds received from an airline partner. Our investment per aircraft varies depending on the commercial terms of our contract with the airline, the technology deployed, and the type of aircraft equipment installed. In 2017, we significantly reduced the installation cost per 2Ku aircraft by shortening the installation time from a week to under two days, and reduced equipment costs through engineering improvements and volume discounts. Our ability to leverage our growing portfolio of STCs will further reduce the cost and time required to install new fleets. We currently have STCs and service bulletins for approximately 80% of the available aircraft types to be equipped with 2Ku. This broad portfolio allows us to reuse STCs to reduce the time and cost required to obtain certification and to accelerate installation schedules. In addition, *as 2Ku's performance has been demonstrated, the amount of our CA revenue derived from airborne equipment has increased as more 2Ku systems are sold at a price higher than the price of other Gogo systems.* As our investment per aircraft

declines and ARPA [average revenue per aircraft] increases, our return on invested capital increases and the payback period is shortened.

(Bold heading in original. Bold & italic emphasis added.)

119.    Attached to the 2017 10-K were SOX Certifications signed by Defendants Small and Rowan, attesting to the accuracy of the 2017 10-K.

120.    The statements referenced in ¶¶ 99-103, 110, and 112-119 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) there existed greater reliability issues with the 2Ku systems' antennae than had been disclosed prior to May 4, 2018; (2) such reliability issues, including deicing fluid penetrating the 2Ku system antennae, required replacement or modification of installed 2Ku antennae, at a large cost to Gogo; (3) as a result, Gogo's 2018 guidance was misleading; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### The Truth Begins to Emerge, While False and Misleading Statements Continue

121.    On February 27, 2018, the Runway Girl Network published an article revealing the contents of an internal memo sent to Delta Air Lines flight attendants on February 24, 2018. Regarding the performance of the 2Ku system, the memo stated, in relevant part: "There is no question that Wi-Fi performance, specifically 2Ku, has been disappointing in recent months. *In some cases there have been outages that took over 30 days to be corrected*."[16]

122.    The memo continued, suggesting that deicing fluid was unlikely to be the sole culprit behind the reliability issues with 2Ku, stating, in relevant part:

---

[16] Emphasis added.

> ***deicing fluid may be causing some of the issues, but it is highly unlikely to be causing this level of outages and degraded antennas***. We now have Gogo sharing their reliability data so that we can identify other issues with the antennas to get them addressed.

(Emphasis added.)

123.     The article contained the following quote from Defendant Wade, defending Gogo's 2Ku technology:

> While we respect that internal memos leaked to media often become news, we also know that those memos without proper context and framework often don't paint the full picture. We stand by what we said before, like all new technologies, we expect a certain amount of troubleshooting to get the system performing the way we engineered it and we are working through those issues.
>
> ***During the height of the cold weather, we discovered an issue with deicing that's affecting performance on a small percentage of 2Ku equipped aircraft***. We know that when our technologies don't work the way they should, Delta and their passengers are not happy. We also know this is particularly problematic for front line employees who have to live it each day. ***A fix is being implemented as we speak for those aircraft affected by the deicing and will be complete by the end of Q1.***
>
> To be clear, though, anyone suggesting that 2Ku can't and won't live up to the performance standards we set is not well informed.

(Emphasis added.)

124.     Defendant Wade's statements above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Defendant Wade failed to disclose that: (1) there existed greater reliability issues with the 2Ku systems' antennae than had been disclosed prior to May 4, 2018; (2) such reliability issues, including deicing fluid penetrating the 2Ku system antennae, required replacement or modification of installed 2Ku antennae, at a large cost to Gogo; (3) as a result, Gogo's 2018 guidance was misleading; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and

prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

125.    On this news, the price per share of Gogo stock fell $0.46 per share, or nearly 5%, from its closing price on the previous trading day, closing at $9.08 per share on February 28, 2018.

### *2018 Proxy Statement*

126.    On April 27, 2018, the Company filed the 2018 Proxy Statement. Defendants Crandall, Jones, LeMay, Mayes, Mundheim, Payne, Townsend, Thorne, and Williams solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[17]

127.    Regarding the Company's Code of Ethics, the 2018 Proxy Statement asserted, in relevant part:

> We have a long-standing commitment to conduct our business in accordance with high ethical principles. Our Code of Business Conduct and Ethics applies to our directors, chief executive officer, chief financial officer, chief accounting officer and all other officers and employees. Our Code of Financial Ethics applies to our chief executive officer, chief financial officer, chief accounting officer and any other key employees performing finance or accounting functions. Copies of the Code of Business Conduct and Ethics and the Code of Financial Ethics may also be accessed on the corporate governance section of our investor relations website at www.ir.gogoair.com.

128.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed, as the Individual Defendants violated the Code

---

[17] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

of Ethics, including by allowing false and misleading statements to be issued to the investing public.

129.   The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay for performance" elements while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

130.   Further, the 2018 Proxy Statement failed to disclose that: (1) there existed greater reliability issues with the 2Ku systems' antennae than had been disclosed prior to May 4, 2018; (2) such reliability issues, including deicing fluid penetrating the 2Ku system antennae, required replacement or modification of installed 2Ku antennae, at a large cost to Gogo; (3) as a result, Gogo's 2018 guidance was misleading; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

**The Truth Continues to Emerge**

*May 4, 2018 Press Release and Conference Call*

131.   On the morning of May 4, 2018, the Company issued a press release announcing its financial results for the quarter ended March 31, 2018. The press release revealed that Gogo would be withdrawing some of its financial guidance for fiscal year 2018 and providing updated guidance no later than its second quarter earnings call, stating, in relevant part:

> *The Company is withdrawing its previously provided 2018 guidance for Adjusted EBITDA, airborne Cash CAPEX, and airborne equipment inventory*

*purchases related to airline-directed installations, as well as Free Cash Flow guidance.* The Company is currently undergoing an integrated business planning process to evaluate ways to further drive revenue growth, streamline business processes, prioritize operational initiatives and improve its cost structure. The Company plans to provide updated guidance no later than on its Q2 2018 earnings conference call.

(Emphasis added.)

132.    The press release provided the Company's 2018 guidance as follows:

For the full year ending December 31, 2018, the Company expects:

- An increase in 2Ku aircraft online of 550 to 650, of which approximately 300 are expected to be in CA-ROW, unchanged from prior guidance.
- Total 2Ku aircraft online as of December 31, 2018 of 1,100 to 1,200, unchanged from prior guidance.
- Total revenue of $865 million to $935 million, unchanged from prior guidance.
    - BA revenue of $285 million to $295 million, unchanged from prior guidance
    - CA-NA revenue of $445 million to $485 million, unchanged from prior guidance
    - CA-ROW revenue of $125 million to $165 million, unchanged from prior guidance
    - Equipment revenue as a percentage of CA-NA revenue and CA-ROW revenue is expected to be higher than prior guidance.
- Adjusted EBITDA[ ] below the previously provided range of $75 million to $100 million.
- Gross capital expenditures of $150 million to $170 million and Cash CAPEX[ ] of $110 million to $130 million, unchanged from prior guidance.

133.    On the afternoon of May 4, 2018, the Company held a conference call with analysts and investors to discuss its financial results for the quarter ended March 31, 2018. During the call, Defendant Thorne admitted that the deicing fluid issues had negatively impacted system availability, stating, in relevant part:

We are achieving the 98% coverage and we're achieving average 15 megabits per second speed globally, but *we slipped on the 98% system availability with our deicing problems*.

(Emphasis added.)

134.     Later during the call, Defendant Thone provided greater specificity into the issues affecting the 2Ku systems' antennae, revealing that in addition to deicing issues, there were software and manufacturing issues with the 2Ku antennae. Defendant Thorne stated, in relevant part:

> Our first quality priority is, obviously, fixing 2Ku. Last summer, 2Ku was our the most successful product launch ever with greater than 98% service availability. And *then came winter and availability plunged down to the mid 80s. The major cause was deicing fluid getting into the antenna raceways in which the antenna discs spin*.
>
> *We've done a thorough analysis of root causes and discovered that while deicing was the biggest issue there are also some manufacturing issues and software issues at fall. We also discovered the deicing fluid entered the antenna radome through far more pathways than we originally thought. We fixed the software issues and we fixed the manufacturing issues. We are in the process of replacing all contaminated antennas of by the end of this quarter.* Our goal was to hit 95% availability by June 30. And I want to repeat this week we are at 96%. So, we're well ahead of plan.
>
> In the second half of this year, we are planning to roll out a set of 2Ku modifications that will keep deicing fluid out of the raceways and get us back to our target of 98% system availability. The benefits of getting 2Ku operating well again are obvious. First, we will get uptick in penetration rates in ARPA, and two prospective airlines will have confidence that the product will work and hopefully sign valuable contracts.

(Emphasis added.)

135.     Defendant Rowan admitted during the earnings call that the issues with the 2Ku antennae were expected to impact the Company's financials, stating, in relevant part: "Adjusted EBITDA is expected to be below the previously provided range of $75 million to $100 million due to increased costs and lost revenue related to the 2Ku implementation challenges we cited."

136.     Later, in response to an analyst's question, Defendant Rowan provided the following breakdown of the expenses associated with resolving the deicing issues:

> With regard to the primary expense buckets related to the issues associated with the deicing, there are several of them. First, as Oak[leigh] described, *we are*

*replacing antennas. So, there's an incremental cost of antenna purchases. There's also the cost of additional airline touches and the work associated with that, and the maintenance personnel.* So those are some of the primary buckets that we see. And also, *it's important to recognize the revenue impact of this, in that the airlines are not going to be motivated to market aggressively until they see the 2Ku system performing at the level that we all expect*, and to that point that they can be more aggressive in the marketing and drive the revenues as we planned.

\* \* \*

[W]e expect in total that those – the expenses, that they aren't going to be in excess of $25 million for the year.

(Emphasis added.)

137. On this news, the price per share of Gogo stock fell $1.73 per share, or 18%, from its closing price on May 3, 2018 over the following two trading days, closing at $7.86 per share on May 7, 2018.

138. After markets closed on May 7, 2018, credit rating service Moody's announced that it had downgraded the Company's credit rating. Moody's rating action stated, in relevant part:

New York, May 07, 2018 -- Moody's Investors Service (Moody's) downgraded Gogo Inc.'s (Gogo) corporate family rating (CFR) to Caa1 from B3, downgraded the company's probability of default rating (PDR) to Caa1-PD from B3-PD, and changed the outlook to negative. Moody's also downgraded Gogo's speculative grade liquidity (SGL) rating to SGL-3 from SGL-2. The company's B2 senior secured rating was affirmed. The downgrade of Gogo's CFR and change in outlook to negative reflects the company's weakening credit metrics, operational difficulties and deteriorating liquidity. The downgrade of Gogo's SGL rating to SGL-3 reflects Moody's expectation that Gogo's liquidity will weaken.

139. Moody's then provided the its rationale for its rating change

Gogo's Caa1 CFR reflects its small scale, competitive operating environment, low margins, high leverage (12.9x Moody's adjusted at year end 2017), and the expectation of negative free cash flow into at least 2019 as the company heavily invests in the rollout of in-flight connectivity technology to additional carriers outside the North American market, where it currently benefits from critical mass in the commercial aviation segment and a dominant position in business aviation.

The rating is supported by this currently strong North American market position, long-term carrier contracts, difficult barriers to entry, and diversified carrier relationships. Gogo's revenue growth profile, which is driven by international expansion and capacity and connectivity upgrades, is dependent on depleting cash balances to fund negative operating cash flow during a protracted growth phase.

140.    Moody's then specifically noted the deicing issues with the 2Ku antennae as a

factor animating its rating downgrade:

Despite a strong performance from Gogo's business aviation segment in the first quarter of 2018, both of the company's two commercial aviation segments -- CA-NA and CA-ROW -- had weak operating performance which diminished consolidated results. ***The performance degradation of antennas in many recently installed 2Ku radomes caused by the infiltration of deicing fluid, used to remove ice from fuselages in winter climates, resulted in slower performance of the company's 2Ku technology, as well as significant remediation costs. Company adjusted EBITDA margin for the first quarter of 2018 was about 5%, down almost 1.5% from the prior year's quarter. These operational issues are expected to negatively impact EBITDA for the year and result in a very low, or potentially slightly negative, company adjusted EBITDA for the second quarter of 2018 since the bulk of remediation expenses will be incurred during the quarter***. While Gogo believes it will have all operational issues related to this execution setback addressed by early summer, visibility is very limited as to the timing of any reversal of current negative revenue and EBITDA trends. Gogo also announced a series of leadership and organizational changes in April 2018, including the hiring of a new CEO. The company is midway through implementation of a new business plan focused on service quality improvement, revenue growth and cost structure optimization, with a June completion date targeted.

(Emphasis added.)

141.    Moody's continued, discussing other negative factors at Gogo that drove the

rating downgrade:

Moody's expects deteriorating operating performance in 2018 and projects Moody's adjusted leverage to remain above 12x. A rapidly declining cash balance will likely impair operating flexibility in 2019. More importantly, and with $362 million of convertible notes coming due on March 1, 2020, Moody's believes a near term refinancing is critical for Gogo to improve its long-term liquidity outlook.

Gogo's SGL-3 short-term liquidity rating indicates Moody's expectation that the company will sustain adequate liquidity through the next 12 to 18 months, but not beyond, with its existing cash balance. We expect negative free cash flow of at least $150 million over the next 12 months due to continued operating

performance deterioration and a likely protracted reversal of current negative trends. As of March 31, 2018, Gogo had $300 million in cash and short term investments and no revolver outstanding, and faces a $362 million convertible notes maturity in about 22 months. Given the company's cash usage rate, the SGL rating would likely be downgraded to SGL-4 if these convertible notes are not refinanced by the end of the third quarter of 2018.

The negative outlook reflects Moody's expectation that operating metrics will remain weak in 2018. If negative free cash flow is greater than Moody's anticipates or if the company fails to improve overall liquidity and address its $362 [million] convertible note maturity due March 2020 by the end of the third quarter of 2018, Moody's could further downgrade the ratings.

142.    Moody's finally provided the following projections for Gogo's credit rating:

Given the expectation for high leverage and negative free cash flow, an upgrade is unlikely. However, upward rating pressure would ensue if Gogo were on a path towards sustainable free cash flow generation. Downward rating pressure could develop if liquidity becomes further strained, revenue growth does not turn positive, or if the company is unable to migrate towards free cash flow generation and improve that free cash flow profile over time. Additionally, debt financed acquisitions and investments which result in a deterioration in cash flow or a material increase in leverage could result in a downgrade

143.    On this news, the price per share of Gogo stock fell $2.80 per share, or over 35%,

from its closing price on the previous trading day, closing at $5.06 per share on May 8, 2018.

Since May 8, 2018, Gogo stock has consistently traded below $6.00 per share.

144.    On the morning of August 8, 2018, the Company issued a press release

announcing its financial results for the quarter ended June 30, 2018.  In the press release, the

Company reaffirmed certain of its 2018 financial guidance, stating, in relevant part:

The Company reaffirms the following 2018 financial guidance:

- Total revenue of $865 million to $935 million
- An increase in 2Ku aircraft on-line to be at the low end of 550 to 650
- Consolidated capital expenditures of $150 million to $170 million and Cash CAPEX[ ] of $110 million to $130 million
- Adjusted EBITDA[ ]  of $35 million to $45 million

145. On the afternoon of August 8, 2018, the Company held an earnings call with analysts and investors. During the call, Defendant Thorne spoke at length about the deicing issues, stating, in relevant part:

> Now, let me turn to *deicing, which mostly affects CA-NA, but also CA Rest of World to some extent*. *We've been very actively working with our airline partners and solutions to the deicing issues ever since last winter. This started with a series of software upgrades in April that significantly improved our system availability. In Q2, we replaced all 2Ku antennas that showed consistent signs of degradation coming out of last winter.*
>
> In order to avoid future degradation, we're taking a belt-and-suspenders approach by identifying as many further solutions as possible, running them through effectiveness quality and safety tests and then deploying as many solutions as practical. By way of background, it's important to understand that for safety reasons, in the Aviation Business it takes a lot of time to design, build, get regulatory approval for and then install a piece of hardware on an aircraft. Some of the solutions we have identified will begin installation later this month and we expect them to be complete by winter.

(Emphasis added.)

146. Defendant Thorne continued, stating:

> We believe these will add even more significant safeguards against the effective deicing than what we've done to date. *Some other solutions are more complex and will require us to rotate updated antenna stock out to airlines to be installed overnight. Those uninstalls will begin in September and they could well drag through the winter.*
>
> We have yet other solutions that are in testing. They could further reduce the risk of fluid getting into the antennas in case our earlier solutions are not effective. We need to assess the effectiveness of our earlier solutions and complete testing before we know if and when we would install those solutions.
>
> We believe that we have identified as many solutions as possible to definitely address this issue and are working collaboratively with our airline partners to tailor installation of these solutions to each of them based on where they fly. *We expect the bulk of the costs associated with these solutions to hit this year and some costs to lapse into next year. But the exact cost is hard to know until we see the effectiveness of early solutions and until we have a plan with each airline*.

(Emphasis added.)

147.    Defendant Rowan clarified that the Company's strong Q2 results were attributable to its business aviation segment, which "surpassed [Gogo's] expectations with overall revenue of $74.2 million, up 28% from a year ago," and commercial aviation outside of the United States. Thus, the reaffirmation of certain of the Company's 2018 guidance came as a result of better than expected results in business aviation, and despite costs associated with the deicing issues. Indeed, Defendant Rowan acknowledged the drag on financial results that the deicing issues were having, stating, in relevant part:

> . . . *once the deicing cost are behind us, the major deinstallation program is complete*, and we execute our Gogo 2020 action plan, *we will be poised to accelerate our service revenue growth and generate positive returns for shareholders*.

(Emphasis added.)

148.    In response to an analyst's question, Defendant Rowan admitted that, despite the Company reaffirming some of its previously issued 2018 guidance, the deicing issues would have a meaningful impact on the Company's EBITDA for 2018:

> I think it's also fair to say that given the guidance range unchanged of $35 million to $45 million and the EBITDA for the first half of the year about $31 million, that *we expect that to be meaningfully impacted particularly by the deicing remediation costs in the second half of the year*. And exactly how that plays out between third and fourth quarter is I think difficult to call depending on the timing and nature of those solutions to be implemented.

(Emphasis added.)

149.    In response to another analyst's question, Defendant Thorne providing the following breakdown of costs associated with the deicing issues:

> With regard to deicing cost, we have - we've incurred about $16 million in expenses in the first half of the year related to that, about $10 million at the expense line, about $6 million in CapEx. So - and there was about $7.5 million of that in the second quarter.

## DAMAGES TO GOGO

150.     As a direct and proximate result of the Individual Defendants' conduct, Gogo will lose and expend many millions of dollars.

151.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its former CEO, its CEO, its former CFO, its CFO, and its COO and Executive Vice President, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

152.     Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including severance payments to Defendant Small exceeding $1 million in total and severance payments to Defendant Smagley of nearly $400,000 in total.

153.     Further, the Company was damaged by the false and misleading statements made in the 2017 Proxy Statement, as the 2017 Proxy Statement induced shareholders to reelect Defendants Jones, Small, and Thorne to the Board, who then continued to harm the Company, giving rise to actionable Section 14(a) claims and breach of fiduciary duty claims.

154.     The Company was also damaged by the false and misleading statements made in the 2018 Proxy Statement, as the 2018 Proxy Statement induced shareholders to reelect Defendants LeMay, Mayes, Mundheim, and Williams to the Board, who then continued to harm the Company, giving rise to actionable Section 14(a) claims and breach of fiduciary duty claims.

155.     As a direct and proximate result of the Individual Defendants' conduct, Gogo has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

156.    Plaintiff brings this action derivatively and for the benefit of Gogo to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Gogo, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

157.    Gogo is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

158.    Plaintiff is, and has been at all relevant times, a shareholder of Gogo. Plaintiff will adequately and fairly represent the interests of Gogo in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

159.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

160.    A pre-suit demand on the Board of Gogo is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Thorne, Crandall, Jones, LeMay, Mayes, Mundheim, Payne, Townsend, and Williams (the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

161.     Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

162.     In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

163.     The Directors knew of the falsity of the misleading statements at the time they were made. The installation and operation of 2Ku system was an integral part of the Company's strategy for providing streaming internet on airplanes. Providing internet connectivity to airplanes is the core operation of Gogo. The adoption of 2Ku technology was highly material to the Company's core operations, as evidenced by numerous press releases issued during the Relevant Period touting the adoption of 2Ku.

164.     As Board members of Gogo, charged with overseeing the Company's affairs, Defendants Thorne, Crandall, Jones, LeMay, Mayes, Mundheim, Payne, Townsend, and Williams all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Gogo, Defendants Thorne, Crandall, Jones, LeMay, Mayes, Mundheim, Payne, Townsend, and

Williams must have been aware of the material facts regarding the reliability issues plaguing its 2Ku systems' antennae.

165.  This inference of actual knowledge of the misleading statements and omissions at issue is supported by the sudden and unexplained departure of Defendant Small as President, CEO and director of Gogo due to a "mutual decision" by Defendant Small and the Board, just days prior to the truth beginning to emerge on March 7, 2018. Such an inference is heightened by the Individual Defendant's decision to pay Defendant Small $58,333 in lieu of the requirement to provide him 30 days' notice of termination.

166.  Therefore, Defendants Thorne, Crandall, Jones, LeMay, Mayes, Mundheim, Payne, Townsend, and Williams each knew of the falsity of the statements and misleading omissions detailed herein at the time such statements were made, and further failed to exercise or recklessly disregarded their duty of oversight to stop or correct such misleading statements and omissions.

167.  Additional reasons that demand on Defendant Thorne is futile follow. Defendant Thorne has served as a Company director since 2006 and has served as the Company's President and CEO since May 4, 2018. He is, as the Company admits, a non-independent director. He receives handsome compensation, including $199,938 in 2017, and is eligible to receive in excess of approximately $1.4 million in 2018. As the Company's top shareholder, holding 29.4% ownership of the Company, Defendant Thorne exercises significant control over the Company. Indeed, he was appointed as CEO and President on May 4, 2018, following the "voluntary" departure of Defendant Small, despite having no previous experience leading a telecommunications company. As a long time Company director and as the Company's CEO and President during part of the Relevant Period, he conducted little, if any, oversight of the

Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Thorne signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K that are referenced herein. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Thorne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168. Additional reasons that demand on Defendant LeMay is futile follow. Defendant LeMay has served as a Company director since 2006, and is the Chairman of the Board. He receives handsome compensation, including $264,943 in 2017. As a long-time Company director and Company Chairman, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant LeMay signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K that are referenced herein. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant LeMay breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169. Additional reasons that demand on Defendant Williams is futile follow. Defendant Williams has served as a Company director since 2014 and serves as Chair of the

Audit Committee. He receives handsome compensation, including $209,938 in 2017. As Chair of the Audit Committee and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Williams signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K that are referenced herein. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Williams breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170. Additional reasons that demand on Defendant Crandall is futile follow. Defendant Crandall has served as a Company director since 2006 and serves as a member of the Audit Committee. He receives handsome compensation, including $189,938 in 2017. As a member of the Audit Committee and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Crandall signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K that are referenced herein. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Crandall breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

171.    Additional reasons that demand on Defendant Jones is futile follow. Defendant Jones has served as a Company director since 2016 and serves as a member of the Audit Committee. He receives handsome compensation, including $189,938 in 2017. As a member of the Audit Committee and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Jones signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K that are referenced herein. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Jones breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172.    Additional reasons that demand on Defendant Mayes is futile follow. Defendant Mayes has served as a Company director since 2016 and serves as a member of the Audit Committee. She receives handsome compensation, including $189,938 in 2017. As a member of the Audit Committee and as a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Mayes signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017

10-K that are referenced herein. She also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Mayes breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

173.    Additional reasons that demand on Defendant Mundheim is futile follow. Defendant Mundheim has served as a Company director since 2012. He receives handsome compensation, including $204,938 in 2017. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Mundheim signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K that are referenced herein. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Mundheim breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Townsend is futile follow. Defendant Townsend has served as a Company director since 2010. He receives handsome compensation, including $189,938 in 2017. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

Moreover, Defendant Townsend signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K that are referenced herein. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Townsend breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant Payne is futile follow. Defendant Payne has served as a Company director since 2014. He receives handsome compensation, including $189,938 in 2014. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Payne signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K that are referenced herein. He also solicited the 2017 Proxy Statement and 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Payne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.    Additional reasons that demand on the Board is futile follow.

177.    The Directors, other than Defendant Thorne, are all beholden to Defendant Thorne by virtue of his 29.4% ownership stake in Gogo and because they depend on the substantial compensation they receive from Gogo. Moreover, Defendant Thorne faces a

substantial likelihood of liability in the Securities Class Action. As a result, the remaining Directors are unable to evaluate a demand with independence, and, therefore, demand is excused.

178.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

179.    Many of the Directors have business and personal relationships arising from shared professional engagements outside of Gogo. For example:

(a)    Defendant Thorne was the Chairman and CEO of eCollege.com prior to its sale, where Defendant Mundheim also previously served as a director.

(b)    Defendant Mayes was the Executive Vice President and General Counsel of Allstate from 2007 to 2012, during which time Defendant LeMay served as a Director of Allstate.

(c)    Defendant Crandall was the CEO and Chairman of American Airlines Inc. from 1985 to 1998. Defendant Jones served in a variety of finance positions at American Airlines from 1988 to 1996, including as Managing Director of Finance.

Upon information and belief, these Defendants developed personal and professional connections as a result of their shared experiences at the aforementioned entities, and such personal and professional connections prevent them from evaluating a demand with independence.

180.    All of the Directors breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business,

operations, and prospects, despite having knowledge of the falsity of those statements. The Directors may not be indemnified for breaching the duty of candor. As a result, all of the Directors face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

181.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Ethics, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

182.    Gogo has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Gogo any part of the damages Gogo suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

183.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-

interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

184.    The acts complained of herein constitute violations of fiduciary duties owed by Gogo's officers and directors, and these acts are incapable of ratification.

185.    The Directors may also be protected against personal liability for their breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Gogo. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Gogo, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

186.    If there is no directors' and officers' liability insurance, then the Directors will not cause Gogo to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

187.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Individual Defendants for Violations of
Section 14(a) of the Securities Exchange Act of 1934**

188.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

190.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

191.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

192.     Under the direction and watch of the Directors, the 2017 Proxy Statement and 2018 Proxy Statement failed to disclose that: (1) there existed greater reliability issues with the 2Ku systems' antennae than had been disclosed prior to May 4, 2018; (2) such reliability issues, including deicing fluid penetrating the 2Ku system antennae, required replacement or modification of installed 2Ku antennae, at a large cost to Gogo; (3) as a result, Gogo's 2018 guidance was misleading; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

193.     The Individual Defendants also caused the 2017 Proxy Statement and 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay for performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

194.     Moreover, both the 2017 Proxy Statement and 2018 Proxy Statement were false and misleading in discussing the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failure to abide by them and to their making and or permitting the Company to make the false and misleading statements and omissions of material fact referenced herein.

195.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement and 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the

matters set forth for shareholder determination in the 2017 Proxy Statement and 2018 Proxy Statement, including election of directors, approval of executive compensation, and ratification of the appointment of an independent registered public accounting firm.

196.     The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants Jones, Small, and Thorne, which allowed them to continue breaching their fiduciary duties to Gogo.

197.     The false and misleading elements of the 2018 Proxy Statement led to the re-election of Defendants LeMay, Mayes, Mundheim, and Williams, which allowed them to continue breaching their fiduciary duties to Gogo.

198.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement and 2018 Proxy Statement.

199.     Plaintiff on behalf of Gogo has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

200.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Gogo's business and affairs.

202.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

203.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The

Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Gogo.

204.    In breach of their fiduciary duties owed to Gogo, the Individual Defendants willfully and/or recklessly wasted corporate assets on excessive severance payments to Defendants Small and Smagley, despite their involvement in the misconduct alleged herein.

205.    In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

206.    In further breach of their fiduciary duties owed to Gogo, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) there existed greater reliability issues with the 2Ku systems' antennae than had been disclosed prior to May 4, 2018; (2) such reliability issues, including deicing fluid penetrating the 2Ku system antennae, required replacement or modification of installed 2Ku antennae, at a large cost to Gogo; (3) as a result, Gogo's 2018 guidance was misleading; and (4) the Company failed to maintain internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

207.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

208.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual

knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Gogo's securities.

209.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Gogo's securities.

210.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

211.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Gogo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

212.    Plaintiff on behalf of Gogo has no adequate remedy at law.

### THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

213.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

214.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Gogo.

215.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Gogo that was tied to the performance or artificially inflated valuation of Gogo, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

216.    Plaintiff, as a shareholder and a representative of Gogo, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

217.    Plaintiff on behalf of Gogo has no adequate remedy at law.

## FOURTH CLAIM

### Derivatively Against Individual Defendants for Waste of Corporate Assets

218.    Plaintiff incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

219.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Gogo to waste valuable corporate assets by paying Defendants Small and Smagley excessive severance, despite their involvement in the misconduct alleged herein.

220.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

221.    Plaintiff on behalf of Gogo have no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Gogo, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Gogo;

(c)     Determining and awarding to Gogo the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Gogo and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Gogo and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Gogo to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Gogo restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

Dated: September 25, 2018                    Respectfully submitted,

/s/*Carl V. Malmstrom*
Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
70 W. Madison St., Suite 1400
Chicago, IL 60602
Tel: (312) 984-0000
Fax: (312) 214-3110
malmstrom@whafh.com

*Liaison Counsel for Plaintiff*

Phillip Kim
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
pkim@rosenlegal.com

*Counsel for Plaintiff*